No. 12-1081

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

ROBERT LEIMKUEHLER, as trustee of and on behalf of the LEIMKUEHLER, INC.
PROFIT SHARING PLAN, and on behalf of all others similarly situated,
*Plaintiff-Appellant/ Cross-Appellee*,

V.

AMERICAN UNITED LIFE INSURANCE COMPANY,
*Defendant-Appellee/ Cross-Appellant.*

_____

On Appeal From an Order by the United States District Court for the
Southern District of Indiana, Indianapolis Division, Case No. 1:01-CV-333-JMS-TAB
Before the Honorable Jane Magnus-Stinson

---

**BRIEF OF THE AMERICAN COUNCIL OF LIFE INSURERS
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE
AND AFFIRMANCE OF SUMMARY JUDGMENT IN FAVOR OF
DEFENDANT-APPELLEE BELOW**

---

Waldemar J. Pflepsen, Jr.
JORDEN BURT LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007
(202) 965-8100

Lisa Tate
AMERICAN COUNCIL
OF LIFE INSURERS
101 Constitution Avenue, NW
Suite 700
Washington, DC 20001
(202) 624-2153

Michael A. Valerio
John C. Pitblado
JORDEN BURT LLP
175 Powder Forest Drive
Suite 301
Simsbury, CT 06089
(860) 392-5000

*Counsel for Amicus Curiae*
*American Council of Life Insurers*

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 12-1081

Short Caption: Leimkuehler v. American United Life Insurance Company

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

American Council of Life Insurers

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jorden Burt LLP

(3)   If the party or amicus is a corporation:

  i)   Identify all its parent corporations, if any; and

  ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/  Waldemar J. Pflepsen, Jr.          Date: August 15, 2012

Attorney's Printed Name: Waldemar J. Pflepsen, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  X    **No** _____

Address: Jorden Burt LLP, 1025 Thomas Jefferson Street, NW, Suite 400 East, Washington D.C., 20007-5208

Phone Number: 202-965-8100          Fax Number: 202-965-8104

E-Mail Address: wjp@jordenusa.com

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 12-1081

Short Caption: Leimkuehler v. American United Life Insurance Company

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
            AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   American Council of Life Insurers

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Jorden Burt LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature:  s/  Michael A. Valerio                    Date: August 15, 2012

Attorney's Printed Name:  Michael A. Valerio

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address:  Jorden Burt LLP, 175 Powder Forest Drive, Suite 301, Simsbury, CT 06089

Phone Number: 860-392-5000                    Fax Number:  860-392-5058

E-Mail Address:  mav@jordenusa.com

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 12-1081

Short Caption: Leimkuehler v. American United Life Insurance Company

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [   ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

American Council of Life Insurers

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jorden Burt LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/  John C. Pitblado          Date: August 15, 2012

Attorney's Printed Name: John C. Pitblado

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: Jorden Burt LLP, 175 Powder Forest Drive, Suite 301, Simsbury, CT 06089

Phone Number: 860-392-5000          Fax Number: 860-392-5058

E-Mail Address: jcp@jordenusa.com

rev. 01/08 AK

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: 12-1081

Short Caption: Leimkuehler v. American United Life Insurance Company

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

American Council of Life Insurers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jorden Burt LLP

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/ Lisa Tate          Date: August 15, 2012

Attorney's Printed Name: Lisa Tate

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ☒

Address: American Council of Life Insurers, 101 Constitution Avenue, NW, Suite 700, Washington, DC 20001

Phone Number: (202) 624-2153          Fax Number: (866) 953-4096

E-Mail Address: LisaTate@acli.com

rev. 01/08 AK

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..............................................................................i

TABLE OF AUTHORITIES .................................................................... ii

IDENTITY AND INTEREST OF AMICUS CURIAE.........................1

INTRODUCTION .....................................................................................3

ARGUMENT .............................................................................................5

I.     REVENUE SHARING IS AN INTEGRAL AND ACCEPTED
       ELEMENT OF THE PRICING AND DELIVERY OF
       RETIREMENT PLAN SERVICES. ..............................................5

       A.    The Role of Revenue Sharing in the Evolution and Pricing
             of Defined Contribution Retirement Plan Services.............6

       B.    The DOL's Consistent View that Receipt of Revenue Sharing
             by a Service Provider like AUL Does Not Implicate any
             Fiduciary Responsibilities under ERISA ...........................15

II.    THE DOL'S ASSERTIONS NOTWITHSTANDING, THIS COURT'S
       "GROUP ANNUITY CASES" AND CO-FIDUCIARY LIABILITY
       CASES DO NOT SUPPORT THE DOL'S NOVEL THEORY THAT
       AUL SOMEHOW BECAME AN ERISA FIDUCIARY
       BY DOING NOTHING..................................................................22

       A.    The DOL's Misapplication of the "Group Annuity Cases"
             Cannot Subvert ERISA's Statutory Prerequisite that There
             Be an *Exercise* of Authority or Control Respecting the
             Management or Disposition of Plan Assets in Order to
             Impose Fiduciary Status .....................................................22

       B.    Cases Involving Alleged Fiduciary Nonfeasance are
             Inapposite ............................................................................26

CONCLUSION.........................................................................................30

CERTIFICATE OF COMPLIANCE.......................................................32

CERTIFICATE OF SERVICE ................................................................33

# TABLE OF AUTHORITIES

**Page**

## <u>Cases</u>

*Auer v. Robbins*, 519 U.S. 452 (1997) ..................................................... 29

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002)........................................ 22

*Chicago Bd. Options Exchange, Inc. v. Conn. Gen. Life Ins. Co.*,
  713 F.2d 254 (7th Cir. 1983) .............................................................. 26

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012).............. 29, 30

*Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732 (7th Cir. 1986), *cert. denied*, 482 U.S. 915 (1987)................................................................. 25

*Free v. Briody*, 732 F.2d 1331 (7th Cir. 1984) ..................................................... 27

*Pegram v. Herdrich*, 530 U.S. 211 (2000)............................................................. 19

*Reich v. Hosking*, No. 94–CV–10363–BC, 1996 WL 182226
  (E.D. Mich. Mar. 7, 1996) ................................................................. 28

*Russello v. United States*, 464 U.S. 16 (1983)...................................................... 22

*Russo v. Pension Ben. Guar. Corp.*, No. 86 Civ. 9741, 1991 WL 254570
  (S.D.N.Y. Nov. 20, 1991)................................................................... 28

*Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health and Welfare Plan v. Bjorkedal*, 516 F.3d 719 (8th Cir. 2008)............... 23

*United States v. Berkos*, 543 F.3d 392 (7th Cir. 2008)......................................... 22

*United States v. Wong Kim Bo*, 472 F.2d 720 (5th Cir. 1972) ............................. 22

## <u>Statutes</u>

29 U.S.C. § 1001 ...................................................................................... 2

29 U.S.C. § 1002(21)(A)............................................................................23

29 U.S.C. § 1104(a) ...................................................................................3

**TABLE OF AUTHORITIES**
**(continued)**

Page

29 U.S.C. § 1105 .................................................................28

29 U.S.C. § 1105(b)(1) .........................................................28

29 U.S.C. § 1106(b) ...............................................................3


**Rules**

Fed. R. App. P. 29(b) .............................................................1

Fed. R. App. P. 29(c)(5) .........................................................1


**Regulations**

29 C.F.R. § 2509.75-8 .........................................................19

77 Fed. Reg. 5632 ...............................................................20


**Other Authorities**

Advisory Council on Employee Welfare and Pension Benefit Plans, *Report of the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices* (2007), *available at* http://www.dol.gov/ebsa/publications/AC-1107b.html ......10

Advisory Council on Employee Welfare and Pension Benefit Plans, *Report of the Working Group on Plan Fees and Reporting on Form 5500* (Nov. 10, 2004), *available at* http://www.dol.gov/ebsa/pdf/ac_111804_report.pdf ................. 8, 10

Brief of The Secretary of Labor, Elaine L. Chao, As Amicus Curiae in Support of Plaintiffs-Appellants (amended), *Hecker v. Deere & Co.*, No. 07-3605, 08-1224 (7th Cir. Apr. 2, 2008), *available at* http://www.dol.gov/sol/media/briefs/main.htm ...............................................................................17

Department of Labor, Employee Benefit Security Administration, *A Look at 401(k) Plan Fees* (revised Oct. 2010), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf .........................................7

TABLE OF AUTHORITIES
(continued)

Page

Department of Labor, Employee Benefits Security Administration, *Fact Sheet: Retirement Security Initiatives* (Nov. 2010) *available at* http://www.dol.gov/ebsa/pdf/fsecp.pdf ...................................................................6

Department of Labor Advisory Opinion 97-16A (May 22, 1997), *available at* http://www.dol.gov/ebsa/programs/ori/advisory97/97-16a.htm .........................15

Department of Labor Advisory Opinion 2003-09A (June 25, 2003), *available at* http://www.dol.gov/ebsa/regs/aos/ao2003-09a.html............................................16

Dow Jones and Matt Ackerman, *Study: Balances Drive Plan Fees*, American Banker (Vol. 174, Issue 72, Apr. 16, 2009), *available at* 2009 WLNR 7040598 ........................................................................5

Employee Benefit Security Administration, *Understanding Retirement Plan Fees And Expenses* (May 2004) *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf .............................................14

Investment Company Institute, *2012 Investment Company Fact Book* (52nd ed. 2012), *available at* http://www.ici.org/pdf/2012_factbook.pdf ..................... 6, 13

Investment Company Institute, *401(k) Plans: A 25-Year Retrospective* (Nov. 2006), *available at* http://www.ici.org/pdf/per12-02.pdf .....................................6

Olivia Mitchell, *New Trends in Pension Benefit and Retirement Provisions* (Feb. 2000), *available at* http://fic.wharton.upenn.edu/fic/papers/00/0006.pdf .............6

Paul Yakoboski, Pamela Ostuw, and Bill Pierron, *1999 Small Employer Retirement Survey,* Employee Benefit Research Institute (Aug. 1999), *available at* http://www.ebri.org/pdf/briefspdf/0899ib.pdf .....................................................8

Sarah Holden and Michael Hadley, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses,* Investment Company Institute Research Fundamentals (Vol. 15, No. 7, Nov. 2006), *available at* http://www.ici.org/pdf/fm-v15n7.pdf .................................................. 8, 9, 12, 13

**TABLE OF AUTHORITIES**
**(continued)**

*Study of 401(k) Plan Fees and Expenses*, Final Report Submitted by Economic
   Systems, Inc. to the Department of Labor, funded by Office of Policy and
   Research, Pension and Welfare Benefits Administration (Apr. 13, 1998),
   *available at* http://www.dol.gov/ebsa/pdf/401krept.pdf ....................................11

## IDENTITY AND INTEREST OF AMICUS CURIAE

Pursuant to a motion for leave under Federal Rule of Appellate Procedure ("FRAP") 29(b), this brief is being filed by the American Council of Life Insurers ("ACLI"), which supports the defendant-appellee, American United Life Insurance Company ("AUL"), in seeking affirmance of the decision below granting AUL's motion for summary judgment.[1]

ACLI is the largest life insurance trade association in the United States, representing the interests of more than 300 legal reserve life insurer and fraternal benefit member companies operating in the United States.  ACLI regularly advocates the interests of life insurers and their millions of policyholders and beneficiaries before federal and state legislators, state insurance commissioners, federal regulators, administration officials, and the courts.  ACLI often files *amicus* briefs in cases, like this one, that involve issues of great importance to its members.

ACLI member companies are the leading providers of financial and retirement security products covering individual and group markets.  They provide life, disability income and long-term care insurance, annuities, pension products,

---

[1] Pursuant to FRAP 29(c)(5), ACLI states that no party's counsel authored this brief in whole or in part, and no party, its counsel, or other person contributed money intended to fund the brief's preparation or submission other than ACLI on behalf of its collective membership.  ACLI notes that AUL is one of ACLI's member companies.

and reinsurance. In the United States, these member companies represent more than 90% of the assets, premiums, and considerations of the life insurance and annuity industry. Their retirement-related business includes group annuities issued to employer-sponsored retirement plans. ACLI members also provide recordkeeping and other administrative services to retirement plan sponsors and participants in connection with these annuity contracts. Most products sold by ACLI members in the group employee benefits market are purchased to fund benefits under plans subject to the requirements of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

Accordingly, ACLI and its members have a substantial interest in this case. ACLI believes that the district court's decision is correct and that several of the arguments advanced by the United States Department of Labor ("DOL") – which has filed an *amicus* brief supporting reversal – are not well-taken. If the decision were reversed, it would raise significant concerns and, potentially, have real consequences for the business operations of ACLI members.

ACLI respectfully submits this brief to facilitate and inform the Court's decision.

## INTRODUCTION

The district court properly granted summary judgment dismissing the claims of the plaintiff-appellant plan trustee, Robert Leimkuehler ("Mr. Leimkuehler"). Based on the undisputed, material facts of record, AUL never acted as an ERISA fiduciary to the Leimkuehler, Inc. Profit Sharing Plan (the "Plan") in connection with AUL's receipt and retention of so-called "revenue sharing" payments from mutual fund companies or their affiliates.   As such, Mr. Leimkuehler has no cognizable claims against AUL under either Section 404(a) or Section 406(b) of ERISA (29 U.S.C. §§ 1104(a) and 1106(b), respectively) because the obligations embodied in those provisions only apply *to* plan fiduciaries *when* they are actually performing a fiduciary function.

However, ACLI's primary purpose in submitting this brief is *not* to reiterate the dispositive reasons advanced by AUL regarding the propriety of the district court's decision – although the brief will touch on some of those reasons from ACLI's broader industry perspective, and it will address a few of the surprising positions taken by the DOL in its *amicus* brief.  Rather, the primary objective of this brief is to assist the Court in better understanding how "revenue sharing" payments have become an essential ingredient in the pricing and delivery of retirement plan services, and why – despite what the DOL says and misapprehends in its current brief – such payments have long been accepted as legitimate by the

DOL as long as the plan service provider does not actually *exercise* unilateral authority or control over revenue sharing-related changes to the plan's originally selected investment options.

If the district court's decision is reversed and Mr. Leimkuehler's unsupported ERISA liability theories are permitted to go forward, the retirement plan services industry generally, and annuity-based service providers in particular, will be forced to rethink the way in which they have operated and priced their business for more than fifteen years with the imprimatur of the DOL.  This business structure includes, as an integral economic component, the accepted practice of revenue sharing.  The consequences of such an industry restructuring are unlikely to be beneficial to either plan sponsors or plan participants.  In fact, the consequences are much more likely to be harmful – in the form of higher costs or reduced product and service offerings – particularly in the small and medium-size plan markets which life insurance companies like AUL primarily service.

In the end, service providers must recover their operating expenses from some source in order to stay afloat.  If those costs are not permitted to be subsidized by the mutual fund companies that benefit from the service providers' business platforms, either the costs will need to be recovered fully from the amalgam of plan sponsors, plans, and plan participants, or the service providers will not be able to offer their current products and services across the market.

# ARGUMENT

## I. REVENUE SHARING IS AN INTEGRAL AND ACCEPTED ELEMENT OF THE PRICING AND DELIVERY OF RETIREMENT PLAN SERVICES.

The market for retirement plan services is undeniably competitive.[2] Service providers such as AUL face constant pressure to offer more services and investment options for less money. Because revenue sharing from the underlying investment providers (*e.g.,* mutual fund companies or their affiliates) subsidizes the cost of the ever-increasing array of services provided to plans and often permits a reduction in direct pricing, it allows service providers to manage costs and benefit customers at the same time. A determination that the receipt of these payments creates fiduciary liability under ERISA would deal an expensive blow to the industry, to plans, and to participants whose retirement savings are at stake. It would almost inevitably cause plans and participants to face increased costs, decreased investment choices (resulting in less diversification and more risk), and ultimately lead to decreased overall retirement savings, contrary to one of ERISA's foundational purposes.

---

[2] *See, e.g.,* Dow Jones and Matt Ackerman, *Study: Balances Drive Plan Fees*, American Banker (Vol. 174, Issue 72, Apr. 16, 2009), *available at* 2009 WLNR 7040598 (reporting on study conducted by Deloitte & Touche for Investment Company Institute regarding primary drivers of fees in 401(k) and other defined contribution retirement plans, which noted that "competition has helped keep fees low").

To put things in perspective, we will begin with some background on the beneficial role of revenue sharing in the growth of private employer-based, defined contribution retirement plans (*i.e.,* "401(k) plans") and the service industry that supports them.

A.     **The Role of Revenue Sharing in the Evolution and Pricing of Defined Contribution Retirement Plan Services**

As of the end of 2011, defined contribution plans held approximately $4.5 trillion in retirement assets, of which over $3 trillion were held by 401(k) plans.[3] Within the private employer market, the number of 401(k) plans has jumped from approximately 98,000 in 1990 to more than 490,000 as of 2007.[4]

However, the 401(k) industry started modestly, as employers moved away from traditional defined benefit pension plans. In the 1980s, 401(k) plans typically offered participants only a few investment options. *See* Olivia Mitchell, *New Trends in Pension Benefit and Retirement Provisions* (Feb. 2000), *available at*

---

[3] *See* Investment Company Institute, *2012 Investment Company Fact Book* (52nd ed. 2012) ("Factbook"), *available at* http://www.ici.org/pdf/2012_factbook.pdf, at 107, 110. In this context, the universe of defined contribution plan assets encompasses 403(b) plans, "457" government plans, and private employer-sponsored plans (including 401(k) plans). *Id.* at 107.

[4] *See* Department of Labor, Employee Benefits Security Administration, *Fact Sheet: Retirement Security Initiatives* (Nov. 2010), *available at* http://www.dol.gov/ebsa/pdf/fsecp.pdf, at 1; Investment Company Institute, *401(k) Plans: A 25-Year Retrospective* (Nov. 2006), *available at* http://www.ici.org/pdf/per12-02.pdf, at 3.

http://fic.wharton.upenn.edu/fic/papers/00/0006.pdf, at 17 ("[T]he modal number of investment choices available for both employee and employer contributions was 3 in 1989."). In the 1990s, as many companies continued to retreat from traditional pension plans, there was increased interest in 401(k) plans and greater demand for more investment choices to ensure that employees would have the ability to diversify and spread risk within their retirement portfolios. "In recent years, there has been a dramatic increase in the number of investment options typically offered under 401(k) plans as well as the level and types of services provided to participants. These changes give today's employees who direct their 401(k) investments greater opportunity than ever before to affect their retirement savings." *See* Department of Labor, Employee Benefit Security Administration, *A Look at 401(k) Plan Fees* (revised Oct. 2010), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf, at 2.

Major brokerage firms – which primarily serviced 401(k) plans through custodial accounts – were the first to address the burgeoning market demand in the early 1990s by offering more mutual fund families on their retirement platforms. In response to the more competitive marketplace, annuity-based service providers (*i.e.,* insurers) – which had previously offered a limited number of primarily affiliate-managed, separate account investment options – also turned increasingly to outside mutual funds for their retirement plan offerings. By incorporating these

new outside investment options, the "open architecture" group annuity contract was born. But the open platform entailed much higher administrative and recordkeeping costs for the service providers. In particular, the service providers had to administer and maintain all of the accounts and transactions in each outside fund down to the individual participant level. *See, e.g.,* Sarah Holden and Michael Hadley, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses,* Investment Company Institute Research Fundamentals (Vol. 15, No. 7, Nov. 2006), *available at* http://www.ici.org/pdf/fm-v15n7.pdf, at 3 ("Administrative service providers also process each and every participant transaction.").

However, "the heavy reliance on pooled investment vehicles such as mutual fund investments . . . caused a dramatic change in the way fees are charged. In particular, the pricing methodology has evolved from the explicit charges billed to and paid by the plan (or by the plan sponsor) into an asset-based fee model." *See* Advisory Council on Employee Welfare and Pension Benefit Plans, *Report of the Working Group on Plan Fees and Reporting on Form 5500* (Nov. 10, 2004), *available at* http://www.dol.gov/ebsa/pdf/ac_111804_report.pdf (the "2004 Working Group Report"), at 5. This shift was beneficial from a plan access and market standpoint because upfront administrative costs had previously made it difficult for small employers to offer 401(k) plans to their employees. *See, e.g.,* Paul Yakoboski, Pamela Ostuw, and Bill Pierron, *1999 Small Employer Retirement*

*Survey,* Employee Benefit Research Institute (Aug. 1999), *available at* http://www.ebri.org/pdf/briefspdf/0899ib.pdf, at 11 (listing administrative cost as a reason for small employers not offering plans).

With this paradigm shift, service providers could now offer a product platform that allowed for greater employer access, greater investment choice, and a new model for pricing the bulk of the services delivered to retirement plan fiduciaries and participants.[5]  An increasing number of fund companies began compensating service providers for the additional "open architecture" costs from the funds' existing expense structure.  Thus, in a generic sense, "revenue sharing" derives from the revenues or assets of either the mutual fund companies or their investment managers or other affiliates.  These arrangements effectively subsidized the plan service providers' costs and allowed service providers to substantially reduce or eliminate the direct charges traditionally imposed on the plans.

Due in large part to the advent of this asset-based model, additional insurance companies and other institutional service providers, including banks, brokerage houses, employee payroll processors, and even mutual fund companies themselves, entered the "open architecture" market.  These providers were able to

---

[5] *See, e.g.,* Sarah Holden and Michael Hadley, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, supra,* at 3 (listing administrative and other services provided to plans and participants).

develop more cost-effective, "one-stop" retirement plan programs – particularly geared toward smaller employers – offering bundled services with access to increasing numbers of investment options. *See* Advisory Council on Employee Welfare and Pension Benefit Plans, *Report of the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices* (2007), *available at* http://www.dol.gov/ebsa/publications/AC-1107b.html (the "2007 Working Group Report"), at 13 ("the DOL view is that *revenue sharing* may be good, in that it *reduces overall plan costs and provides the plans, especially small ones, with services and benefits which might not be affordable*") (emphasis added).

The outside mutual fund companies were willing to "share" revenue because (1) the plan service providers had effectively assumed the mutual fund companies' administrative, transactional, and communications functions with respect to both the plan sponsors and the individual plan participants, relieving the mutual fund companies of primary responsibility for such services as issuing quarterly statements, maintaining a call center, keeping the plan participants' daily account balances, handling participant or even plan-level transactions (the service providers packaged each day's transactions through omnibus trading accounts), and distributing fund materials and other investor information;[6] and (2) to the extent

---

[6] *See, e.g.,* 2004 Working Group Report, *supra*, at 2 ("[M]any plan fiduciaries enter into bundled arrangements with plan service providers for record keeping or (footnote continued on next page)

that the mutual funds were offered on their platforms and selected by plans and
participants, the service providers were effectively assuming distribution
responsibility (and its associated costs) on behalf of the mutual fund companies.[7]

In addition, some mutual fund companies began to make more than one
share class of their funds available to service providers for potential use in the
providers' retirement plan products.   In such cases, as part of its product
development process, each service provider would pre-determine the share class
(which corresponds to a specific expense ratio) of each fund to be offered on each
product platform based on a number of business considerations, including
anticipated product asset levels, per-plan investment thresholds, competitive
market conditions, and the level of administrative and distribution costs the service

---

other administrative services which typically do not entail explicit charges to the
plan.   Rather, in a bundled arrangement plan service providers such as record
keepers and trustees often are compensated for their services to the plan from the
underlying mutual fund investment through either (1) 'sub-transfer agent fees,'
12(b)(1) fees, or other administrative fees, or (2) through 'revenue sharing'
arrangements whereby the mutual fund's advisor compensates the provider directly
from its profits for the services provided.   In either case, the fees and expenses are
not paid from 'plan assets,' but rather from a portion of the mutual funds'
operating expense which is shared with the plan's service provider.").

[7] *See, e.g., Study of 401(k) Plan Fees and Expenses*, Final Report Submitted by
Economic Systems, Inc. to the Department of Labor, funded by Office of Policy
and Research, Pension and Welfare Benefits Administration (Apr. 13, 1998),
*available at* http://www.dol.gov/ebsa/pdf/401krept.pdf, at 29 ("[D]istribution fees
are typically charged against the participants' accounts.   Distribution fees
compensate the distribution network participants for their labor.").

provider was assuming, while taking into account any direct asset-based or "hard-dollar" revenue elements associated with each product offering. *See generally* Sarah Holden and Michael Hadley, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, supra*, at 6-11 (discussing, among other things, fund share classes used in various 401(k) investment platforms based on differing plan/participant service levels and pricing/cost-allocation structures).

Based on the arguments advanced in its brief, the DOL clearly fails to appreciate the holistic relationship between fund share classes, revenue sharing, and the pricing of retirement product offerings. *See, e.g.,* DOL Br. at 1-2 (referring to "availability of less expensive alternative share classes to the plan"). The fund share classes used by a given service provider – and their corresponding expense ratios – are at the product design phase "baked into" the specific product offering and its associated pricing structure. Thus, there generally are no other share classes "available" to plans or participants within each product offering, which the named plan fiduciary (here, Mr. Leimkuehler) is of course free to accept or reject. In this case, there is no evidence that AUL deviated from this product/pricing structure or *exercised* any form of post-contract-formation "control" over plan assets (or, to put it another way, that AUL somehow did a share class "bait and switch" after the Plan selected its fund lineup and participants began directing

investments), *regardless* of the boilerplate "reservation-of-rights" clause in the group annuity contract.

Notably, even with direct charges to plans trending downward as revenue sharing became the industry norm in the 2000s, average mutual fund expense ratios also *decreased*, thus further reducing overall costs for plan participants. *See, e.g.,* Investment Company Institute, Factbook, *supra*, at 69, 71 (graphing general decline in mutual fund expense ratios from 1990 through 2011).[8] *See also* Sarah Holden and Michael Hadley, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, supra*, at 10 ("Several factors contribute to the relatively low average expense ratios incurred by 401(k) plan participants investing in mutual funds. Both inside and outside the 401(k) plan market, mutual funds compete among themselves and with other financial products to offer shareholders service and performance.").

As a result of the market evolution, revenue sharing became an essential component of the pricing model for retirement plan services.[9] The exclusion of

---

[8] These graphs (i) "exclude mutual funds available as investment choices in variable annuities and mutual funds that invest primarily in other mutual funds" and (ii) "report[] year-end asset-weighted average of annual expense ratios for individual funds." *Id.* at 71 nn.1-2.

[9] By way of background, the pricing of group annuity contracts and similar funding vehicles issued by retirement plan service providers generally seeks to (1) recover all expenses associated with (i) the administration and service aspects of the (footnote continued on next page)

revenue sharing from pricing considerations naturally would reduce the expected overall revenue, while expenses would remain the same. The only way to recover those expenses and achieve the same level of return would be to increase the price of the product through either "hard dollar" fees to the plan sponsor customers or a higher asset-based fee to plan participants. But this could again result in small employers being frozen out of the 401(k) market. Alternatively, the provider could reduce service levels and investment offerings in an effort to decrease its expenses while holding the line on pricing. But this alternative could still have the deleterious effect of lowering plan participation and contribution rates.

In sum, the elimination of revenue sharing would require the restructuring and re-pricing of the entire retirement plan services industry in a way that is not likely to be beneficial – but rather, is more likely to be detrimental – to plans and participants.

---

product, (ii) producer compensation, (iii) marketing, (iv) overhead, and (v) provision for risk (if applicable); and (2) provide a return on invested capital. Pricing models for the business typically project estimated revenues, expenses, taxes, and required capital on an aggregate level for a particular type of product that, in turn, yield a target return. *Cf.* Employee Benefit Security Administration, *Understanding Retirement Plan Fees And Expenses* (May 2004), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

**B.    The DOL's Consistent View that Receipt of Revenue Sharing by a Service Provider like AUL Does Not Implicate any Fiduciary Responsibilities under ERISA**

Leaving aside for the moment the potential confusion caused by the DOL's *amicus* brief in this case (addressed *infra*), the "rules of the road" regarding how service providers stay on the *non*-fiduciary side of the line have been clear essentially from the inception of revenue sharing in the 1990s.  DOL guidance has been consistent regarding the *lack* of any nexus between (i) a service provider's mere receipt and retention of revenue sharing and (ii) ERISA fiduciary status.  In this respect, the industry has relied for over fifteen years on DOL Advisory Opinion 97-16A (the so-called "Aetna Letter").

The Aetna Letter was instructive to the industry in several respects.  On a threshold level, the DOL made clear its view that a service provider's offering of a menu of investment options, from which an appropriate plan fiduciary selects the options to be offered to plan participants, does not give rise to any fiduciary obligations on the part of the service provider.  *See* DOL Adv. Op. 97-16A (May 22, 1997), *available at* http://www.dol.gov/ebsa/programs/ori/advisory97/97-16a.htm, at 1, 3-5.  In the Aetna Letter, the DOL also determined that, provided certain conditions relating to notice are met, an annuity-based 401(k) service provider like AUL does not become a fiduciary under ERISA with respect to revenue sharing payments *even if* the service provider *makes* additions, deletions,

or substitutions to the underlying funds *actually selected* as investment options by the plan sponsor/fiduciary. *See id*. As long as the named plan fiduciary in fact has the opportunity to accept or reject the proposed change, the service provider assumes no fiduciary responsibility. *Id.* at 5.

Since the Aetna Letter was issued, the DOL has given no indication that it intends to alter its guidance on these issues. To the contrary, the DOL reaffirmed that guidance six years later. *See* DOL Adv. Op. 2003-09A (June 25, 2003), *available at* http://www.dol.gov/ebsa/regs/aos/ao2003-09a.html, at 4-5 (reaffirming Aetna Letter principle that plan fiduciary must, in fact, have final say on fund changes, and finding that trustee/service provider's receipt of revenue sharing payments from fund companies does not violate ERISA where "the decision to invest in [the funds] is made by a fiduciary who is independent of [the service provider], or by participants of such employee benefit plans"). Nowhere in the numerous DOL publications disseminated over the years has the agency ever suggested the view that an administrative service provider like AUL somehow becomes an ERISA fiduciary as a result of its negotiation and receipt of revenue sharing payments.

More recently, in an *amicus* brief filed in the *Hecker v. Deere & Co.* appeal before this Court, the DOL again made clear its position that a retirement plan service provider does *not* become "a fiduciary merely by virtue of developing and

presenting a list of investment options to [a plan sponsor] for its selection as a fiduciary."  Brief of The Secretary of Labor, Elaine L. Chao, As Amicus Curiae in Support of Plaintiffs-Appellants (amended), *Hecker v. Deere & Co*., Nos. 07-3605, 08-1224 (7th Cir. Apr. 2, 2008), *available at* http://www.dol.gov/sol/media/briefs/main.htm, at 22-23.

The DOL reiterates this position in its current *amicus* brief, which is consistent with its longstanding recognition of revenue sharing as an accepted and often beneficial element of the plan services pricing model.  *See* DOL Br. at 24 ("the Secretary agrees that a service provider does not become a fiduciary merely because it presents a limited range of investment options to plan fiduciaries who then decide whether the investments are appropriate . . .").[10]  Importantly, the DOL also reaffirms its longstanding Aetna Letter guidance regarding the prerequisites for a service provider to avoid fiduciary status with respect to revenue sharing when the service provider intends to make an investment option change that would

---

[10] However, as will be elaborated below, the DOL is wrong in further stating that "that principle has no application here."  *Id.*  "That principle" applies with the same force here as it did in *Hecker* because the undisputed record confirms – and the DOL does not dispute – that, while the parties' contract has been in force, AUL has *never* initiated any relevant (*i.e.*, revenue sharing-related) changes to the investment options Mr. Leimkuehler selected for the Plan, including any changes to the associated share classes of the mutual funds initially offered to Mr. Leimkuehler.  That is the beginning and end of the story when it comes to the absence of fiduciary status in this case.

affect the options already selected by a particular plan customer (*i.e.*, when the service provider seeks to **exercise** the change authority it has reserved under the annuity or other plan service contract) – *a circumstance that the parties agree never arose within the limitations period in this case*. *See id.* at 22-23 (citing Aetna Letter, albeit *wrongly* suggesting (i) that the opinion can be applied, as is the case here, to an *unexercised* contractual reservation-of-rights provision (by the opinion's terms, it cannot) and (ii) even if the opinion could somehow be applied to the current situation, that it *requires* the parties' written *contract* to specify the nature and extent of advance notice and "veto power" to be provided to the named plan fiduciary (again, by its terms, it does not)).

To put it benevolently, the DOL's brief gets ahead of – and outside of – the actual, undisputed facts by arguing that *if* AUL decided to initiate mutual fund or share class changes to the Plan's chosen investment lineup, the Plan might *not* have "final say" over any such changes as mandated by the Aetna Letter. *See* DOL Br. at 22 (section entitled "AUL Could Have Avoided Fiduciary Status by Giving the Plan 'Final Say' Over Share Class Selections"). Again, AUL has never tried to initiate any relevant changes to the investment options Mr. Leimkuehler selected for the Plan; thus, no one knows whether, in that counterfactual world, AUL would have provided the Plan with the requisite opportunity to have the "final say" in order to avoid ostensible fiduciary responsibility. A single, isolated "reservation-

of-rights" provision in the annuity contract does not tell us what AUL actually would have done – or what Mr. Leimkuehler would have done, for that matter – if the hypothesized exercise of contractual authority had occurred.[11]

The tipping point for fiduciary status under ERISA is whether the alleged conduct reflects the exercise of discretion or control, rather than being merely ministerial.[12] In a decades-old Interpretive Bulletin, the DOL specified that the types of administrative tasks that service providers like AUL perform under their plan contracts do not confer fiduciary status. *See* 29 C.F.R. § 2509.75-8 (identifying the following tasks as ministerial and non-fiduciary in nature: "(1) Application of rules determining eligibility for participation or benefits; (2) Calculation of services and compensation credits for benefits; (3) Preparation of

---

[11] Moreover, as the United States Supreme Court has observed:

> In every case charging breach of ERISA fiduciary duty, ... the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

[12] Of course, as discussed further below, the DOL's novel fiduciary position here reads the "exercise" requirement out of the relevant ERISA provision because, among other reasons, AUL admittedly engaged in *no* affirmative conduct other than the ongoing ministerial task of allocating plan and participant contributions as directed.

employee communications material; (4) Maintenance of participants' service and employment records; (5) Preparation of reports required by government agencies; (6) Calculation of benefits; (7) Orientation of new participants and advising participants of their rights and options under the plan; (8) Collection of contributions and application of contributions as provided in the plan; (9) Preparation of reports concerning participants' benefits; (10) Processing of claims; and (11) Making recommendations to others for decisions with respect to plan administration.").

The burden of a fiduciary role under ERISA is not something to be taken lightly. Based in large part on the longstanding and consistent DOL guidance, retirement plan service providers that utilize revenue sharing were confident that they were avoiding the inadvertent assumption of a fiduciary role when structuring their products, services, and business models.[13] The DOL's seemingly paradoxical

---

[13] To the extent the DOL is concerned about AUL's assumed "failure" to disclose its revenue sharing practices to Mr. Leimkuehler, the disclosure issue has now been addressed industry-wide by the new DOL regulation that went into effect last month. *See* 77 Fed. Reg. 5632 (Feb. 3, 2012) (noting July 1, 2012 effective date). The DOL has apparently lost sight of the fact that, prior to this new regulation, service providers were not required to disclose revenue sharing or other indirect compensation to plans – let alone disclose it roughly twelve years ago when Mr. Leimkuehler contracted with AUL. *See* Pl. Br. at 3. Moreover, ACLI is not aware of any law or regulation that requires a service provider to specifically "disclose" the denominated share class (or other "available" share classes) of the funds it offers through its retirement products. What is factually significant, as the district court found to be undisputed, is that AUL disclosed the total expense ratio (footnote continued on next page)

stance in urging reversal in this case because the annuity contract contains an unexercised, generic "reservation-of-rights" provision – while avowedly standing behind the historical guidance expressed in its advisory opinions (under which AUL and many other annuity-based providers have operated for years) that clearly requires affirmative, "plan investment-altering" provider conduct to trigger potential fiduciary responsibility – is disconcerting to ACLI, to say the least.  Thus, ACLI feels compelled to briefly address some of the more significant examples of the DOL's incorrect legal arguments which go beyond merely failing to recognize that the undisputed facts of this case cannot trigger any fiduciary status on the part of AUL and do not even implicate an "Aetna Letter" analysis.

---

applicable to the share class AUL utilized for each mutual fund in the retirement product offered to and selected by Mr. Leimkuehler.  RSA 4.

## II. THE DOL'S ASSERTIONS NOTWITHSTANDING, THIS COURT'S "GROUP ANNUITY CASES" AND CO-FIDUCIARY LIABILITY CASES DO NOT SUPPORT THE DOL'S NOVEL THEORY THAT AUL SOMEHOW BECAME AN ERISA FIDUCIARY BY DOING NOTHING.

### A. The DOL's Misapplication of the "Group Annuity Cases" Cannot Subvert ERISA's Statutory Prerequisite that There Be an *Exercise* of Authority or Control Respecting the Management or Disposition of Plan Assets in Order to Impose Fiduciary Status

The operative statutory provision of the ERISA "fiduciary" definition requires an actual *exercise* of authority or control.  As Mr. Leimkuehler himself states in his brief:

> "Statutory interpretation begins with the plain language of the statute," and "[a]bsent clearly expressed Congressional intent to the contrary, the plain language should be conclusive." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). . . . Of particular relevance here "is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))).

Pl. Br. at 15.  ACLI agrees in principle with Mr. Leimkuehler's observations regarding these rules of statutory construction as they relate to ERISA's "exercise" requirement.  Unfortunately, however, the DOL advances arguments throughout its *amicus* brief that cannot be reconciled with these rules.

As all parties seem to agree, the operative provision of the ERISA statutory definition for purposes of this appeal states that "a person is a fiduciary with respect to a plan to the extent (i) he . . . *exercises* any authority or control respecting management or disposition of [plan] assets." 29 U.S.C. § 1002(21)(A)(i) (emphasis added). Significantly, the last provision of the same definitional section states that one can also be a plan fiduciary to the extent that he "*has* any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii) (emphasis added). Applying Mr. Leimkuehler's stated rules of statutory construction, the operative provision requires an "*exercise*" of the requisite "authority or control" in order for one to be deemed a "fiduciary," at least "to the extent" of such exercise.[14] The word "exercise" is not superfluous or unintended, and it requires affirmative conduct. *See, e.g., Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health and Welfare Plan v. Bjorkedal*, 516 F.3d 719, 733 (8th Cir. 2008) ("An act of omission fails to satisfy the requirement that the individual *exercise* discretionary authority over plan assets.") (emphasis in original). Nevertheless, the DOL's position in essence reads the "exercise" requirement out of the statute.

---

[14] ACLI does not intend in this brief to further address the "to the extent" limitation of ERISA's statutory definition. This critical limitation on the scope of ERISA fiduciary responsibility is discussed on pages 14-16 of AUL's principal brief.

Of initial note, both Mr. Leimkuehler and the DOL conflate AUL's indisputably *non-fiduciary* conduct in designing and offering its retirement product investment option menu (with the associated expense ratios/share classes of the offered funds pre-selected by AUL as part of its non-fiduciary product design process), on one hand, with a purported *fiduciary* exercise of authority or control over the Plan-selected and participant-directed investments *after* Mr. Leimkuehler purchased the product and selected the Plan's fund lineup, on the other. *See, e.g.,* Pl. Br. at 30 ("since AUL does not place a purchase order with a mutual fund for any particular share class until well after a plan and its participants have made their investment choices, it does not make its actual share class selection until it places the buy order. . ."); DOL Br. at 27 ("AUL exercised its discretionary authority every time it invested plan assets in particular share classes . . .").[15]

Mr. Leimkuehler's rhetorical arguments, joined by the DOL, are not supported by the relevant facts or law. As the district court correctly recognized, the undisputed facts simply do not support the notion that AUL exercised any relevant authority or control over Plan assets after contract inception. *See, e.g.,* RSA 17 ("Mr. Leimkuehler has presented neither argument nor evidence that AUL ever diverted assets from [where] Plan participants directed that they be sent.").

---

[15] Notably, these assertions are not followed by any citations to the evidentiary record, and ACLI is not aware of any support in the record for them.

Similarly, there is no evidence that AUL ever substituted "revenue sharing"-paying funds during the relevant period or changed any share classes of the Plan's selected funds at any time – whether pursuant to AUL's "reservation of rights" or otherwise. *See, e.g., id.* at 18 ("There is no evidence . . . that AUL purchased a share class that resulted in higher expenses than the expenses disclosed to the participant . . .").[16]

The Seventh Circuit decisions cited by the DOL (which the DOL calls the "group annuity cases" – *see* DOL Br. at 20-22), where parties were purportedly deemed functional fiduciaries as a result of their discretionary contractual authority, are decidedly unhelpful to the DOL's position here. Among other things, these cases involved claims that the purported functional fiduciary *acted* unilaterally in a way that *altered* the value of the plan contract or benefits. *See, e.g., Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 734 (7th Cir. 1986), *cert. denied*, 482 U.S. 915 (1987) (regarding group life insurance benefits,

---

[16] It should also be noted that, despite the DOL's repeated suggestions to the contrary, the touted "reservation of rights" clause in the AUL annuity contract makes no mention of share classes. *See* JA 619-20. Thus, it is questionable whether the DOL has any factual basis for its foundational "authority or control" argument before even reaching the complete absence of evidence to support an "exercise" of such purported authority. This absence of any apparent reservation of "share class" change authority in the contract provision itself also undermines the DOL's basis for what is, at best, an inappropriate request for an advisory opinion from the Court regarding hypothetical, prospective conduct.

"Plaintiffs allege that about July 1983 [defendant insurer] unilaterally and without justification announced . . . an abandonment of existing policy holders, by *reducing the rate of return* paid on account from 10% to 7% to 4% per annum by November 1, 1983 *and increasing premium rates* to the maximum allowed by the policy") (emphasis added); *Chicago Bd. Options Exchange, Inc. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 255, 259 (7th Cir. 1983) ("The dispute has its genesis in Connecticut General's *unilateral amendment* of an annuity contract it entered into with [plaintiff CBOE to fund retirement benefits.]"; "The parties differ . . . as to *whether Connecticut General's amendment of the contract is sufficient to charge it with fiduciary obligations.*") (emphasis added).  Rather than bolster the DOL's position, these decisions simply reinforce the point that an exercise of authority or control is required.  Moreover, the Court was presumably well aware of these previous pronouncements when it rendered its decision in *Hecker*, which is directly on point.

In sum, the "group annuity cases" do not support either Mr. Leimkuehler's or the DOL's attempted end-run around the statutory prerequisites for fiduciary status under ERISA.

## B.    Cases Involving Alleged Fiduciary Nonfeasance are Inapposite

Faced with no evidence that AUL ever *exercised* any purported "authority or control" to substitute funds or change share classes in the Plan's investment lineup,

the DOL suggests that *not exercising* authority or control is, in essence, an "exercise" of authority just the same. In support of this argument, the DOL points to so-called fiduciary "nonfeasance" cases. *See, e.g.*, DOL Br. at 18 ("[E]ven if AUL's investment of plan assets in mutual funds could somehow be construed as 'unexercised' authority because AUL consistently invested plan assets in the same mutual funds and share classes, the Seventh Circuit has long held that a fiduciary may be liable for nonfeasance.").

These "nonfeasance" cases do not in any way support the DOL's position. They concern situations where an acknowledged (or adjudged) plan fiduciary allegedly breached its fiduciary duty by failing to act where it had a clear affirmative duty to do so. They each involve alleged co-fiduciary liability, where one "passive" plan fiduciary failed to stop another plan fiduciary from engaging in prohibited transactions or other active breaches of fiduciary duty. The cases bear no relation to the threshold issue of fiduciary status presented here: namely, whether AUL exercised any relevant authority or control over the Plan's selected investments by doing nothing beyond executing Plan or participant investment instructions. Rather, the "nonfeasance" cases involve the unrelated issue of whether one of two co-fiduciaries breached a prophylactic duty to a plan.

The DOL principally relies on *Free v. Briody*, 732 F.2d 1331 (7th Cir. 1984). In *Free*, this Court affirmed the co-fiduciary liability of Louis Briody, who

was a named co-trustee of an ERISA-governed pension plan. It was established at

trial that Mr. Briody essentially stood by and did nothing while his co-trustee and

company owner, Mr. Hodgman, engaged in a series of questionable transactions

with plan funds that resulted in the loss of all plan assets and the bankruptcy of the

company. The Court specifically noted Mr. Briody's duty arising from his

*acknowledged status* as an ERISA co-fiduciary. *See id*. at 1335 (noting that

"Section 1105(b)(1) of ERISA provides that: 'if the assets of a plan are held by two

or more trustees—(A) each shall use reasonable care to prevent a co-trustee from

committing a breach . . .'"). Obviously, *Free* has nothing to do with the

disposition of the threshold fiduciary status issue before the Court here.

The unreported district court cases cited by the DOL fare no better. In *Russo

v. Pension Ben. Guar. Corp.*, No. 86 Civ. 9741, 1991 WL 254570 (S.D.N.Y. Nov.

20, 1991), the court also addressed co-fiduciary liability under ERISA § 405, 29

U.S.C. § 1105, where a named trustee failed to prevent a co-fiduciary from

misappropriating plan assets. *See id.* at *7 ("From October 1985 to February 1986

Alan Unger misappropriated funds from trusts that [trustee and co-fiduciary]

Theresa [Unger] was obliged to oversee."). In *Reich v. Hosking*, No. 94–CV–

10363–BC, 1996 WL 182226 (E.D. Mich. Mar. 7, 1996), the court addressed

whether the defendant de facto trustee had actual knowledge of an alleged

prohibited transaction by another plan fiduciary, or otherwise breached an

affirmative duty to investigate.  *See id*. at *6 ("There is no genuine issue of fact regarding Defendant Johnson's lack of actual knowledge that the withheld amounts were not timely paid to the Plan. . . . However, the question of whether Defendant Johnson did not act as a prudent person in failing to undertake a more rigorous examination remains.").  Again, these cases are facially inapposite.

The DOL has no support for its "fiduciary-exercise-by-nonexercise" argument.  Adoption of such a nontextual theory would swallow the well-established ERISA principle – long supported by the DOL and relied upon by the service provider industry for years – that retirement product design activities entail no exercise of fiduciary responsibility.  AUL did nothing more than this.  As the Supreme Court recently observed in refusing to give the customary deference to the DOL's entirely new interpretation of its own Fair Labor Standards Act ("FLSA") regulations unveiled in its Supreme Court *amicus* brief, "[w]e find the DOL's interpretation of its regulations quite unpersuasive.  The interpretation . . . plainly lacks the hallmarks of thorough consideration. . . . This new interpretation is flatly inconsistent with the FLSA . . ."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2169 (2012).[17]  Similar observations could be made of the

---

[17] The Supreme Court further observed:  "In this case, there are strong reasons for withholding the deference that *Auer* [*v. Robbins*, 519 U.S. 452 (1997)] generally requires. . . . To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties (footnote continued on next page)

DOL's current "interpretation" of the ERISA fiduciary definition – as it purportedly relates to AUL's non-fiduciary offering of its investment option menu and ministerial servicing of the Leimkuehler Plan – advanced for the first time in the DOL's *amicus* brief here.

## CONCLUSION

For the foregoing reasons, in addition to the reasons set forth in the Brief of Defendant-Appellee, *amicus curiae* ACLI respectfully requests that this Court affirm the district court's order granting summary judgment in AUL's favor.

---

'fair warning of the conduct [a regulation] prohibits or requires.'"  *Christopher*, 132 S. Ct. at 2167 (citation omitted; second bracket in original).  Of course, here, consideration of *Auer* deference is not even warranted because the DOL is offering an unpersuasive "interpretation" of a Congressional enactment rather than one of its own regulations.

Dated:  August 15, 2012

Respectfully submitted,


/s/ Waldemar J. Pflepsen, Jr.
WALDEMAR J. PFLEPSEN, JR.

James F. Jorden
Waldemar J. Pflepsen, Jr.
JORDEN BURT LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007
Telephone: (202) 965-8100
Facsimile:  (202) 965-8104

Michael A. Valerio
John C. Pitblado
JORDEN BURT LLP
175 Powder Forest Drive, Suite 301
Simsbury, CT 06089
Telephone: (860) 392-5000
Facsimile:   (860) 392-5058

Lisa Tate
AMERICAN COUNCIL OF LIFE
INSURERS
101 Constitution Avenue, NW, Suite 700
Washington, DC 20001-2133
Telephone: (202) 624-2153
Facsimile:  (866) 953-4096

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 6,990 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


Dated:  August 15, 2012          /s/ Waldemar J. Pflepsen, Jr.
                                 WALDEMAR J. PFLEPSEN, JR.

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2012, I filed the foregoing Amicus Curiae Brief Of American Council Of Life Insurers In Support Of Appellee American United Life Insurance Company And Affirmance Of The Order Below with the Clerk of the Court via the Court's CM/ECF electronic filing system.  Counsel for all parties are registered users and will be served by the CM/ECF system.

/s/ Waldemar J. Pflepsen, Jr.

WALDEMAR J. PFLEPSEN, JR.